## United States District Court for
### The District of South Dakota

| | |
|---|---|
| **WEBVIOUSLY, INC.,**<br>          Plaintiff, | 4:22-cv-  4079  |
| v. | |
| **INTERNATIONAL BUSINESS MACHINES CORPORATION,**<br>          Defendants. | **COMPLAINT** |

For its Complaint, the Plaintiff claims the following:

### Parties & Jurisdiction

1. Plaintiff, Webviously, Inc., is a South Dakota corporation with its principal place of business in South Dakota.

2. Defendant International Business Machines Corporation is a New York corporation, headquartered in Armonk, New York, and maintains operations in South Dakota, all other U.S. States and Territories, and 171 countries.

3. This Court has personal jurisdiction of the parties because Plaintiff is a South Dakota corporation, and, IBM is a foreign corporation registered with the South Dakota Secretary of State (Business ID: FB000510).

4. A related entity (but a non-party) to these proceedings (GoDaddy.com LLC) is the registrar of certain domain names which are pertinent to this dispute. GoDaddy is a Delaware corporation with a principal office in Tempe, Arizona, and similar to IBM, conducts business in South Dakota and has registered with

1

the South Dakota Secretary of State as a foreign limited liability company (Business ID: FL044517).

5.  As is evidenced by their foreign entity filings, and their pervasive operations nationwide, both IBM and GoDaddy have "continuous and systematic contacts with" South Dakota, the forum state in this action.

6.  This Court has original jurisdiction over this matter by virtue of a federal question arising from the Digital Millennium Copyright Act: one of Plaintiff's causes of action arises out of knowing, material misrepresentations made by IBM in a pair of takedown notices, which is misconduct proscribed by 17 U.S.C. § 512(f).

7.  This Court also has diversity jurisdiction over the parties.

## VENUE

8.  Venue is proper in this District because it embraces the legal corporate office of Webviously, Inc., as well as the situs of ongoing, systematic contacts that Defendant has with the forum.

9.  In addition, pursuant to UDRP Rules, this District is a proper forum because it is a court of "Mutual Jurisdiction," which includes "the location of…the domain-name holder's address as shown for the registration of the domain name in Registrar's Whois database at the time the complaint is submitted to the Provider."

## SHORT SUMMARY

10. In August 2021, on the 40-year-anniversary of the creation of the world's first personal computer, Webviously launched a website at <IBMPC.io> to market the sale of collectible, electronic artwork that celebrated and commemorated this milestone.

11. Webviously's artwork features high-resolution, vector-art images of the original IBM 5150 desktop computer, its monitor, and accessories.   All of the detail in the images was created by Webviously.   The resulting images are incorporated into digital, collectible trading cards sold as limited edition NFTs. [1]

12. Webviously chose the domain name <IBMPC.io> to market this digital artwork.

13. Webviously is not affiliated with IBM.   It is just a really big fan.

14. In response, IBM initiated two, parallel attempts to interfere with Webviously's efforts.   First, IBM issued a "takedown notice" to the entity hosting Webviously's public facing interface, and second, IBM filed an administrative WIPO complaint seeking to cancel/transfer Webviously's registration of <IBMPC.io>.

---

[1] Webviously's artwork is described in more detail in Annex 2 to IBM's Complaint, submitted by IBM in the underlying administrative proceeding.   The pleadings and filings from that administrative proceeding are incorporated here by reference.

15.   Both attempts were wrong and wrongful.  The "takedown notice" contained knowingly false misrepresentations.  And the arguments made in its WIPO complaint were insufficient, legally and factually, to merit a transfer or cancellation.

16.   Webviously brings this suit to rectify both matters.

<u>**FACTS**</u>

17.   The phrase "IBM PC" became a generic mark in the 1980s, and, IBM thus has no rights to the "IBM PC" mark.   The phrase "IBM PC" is world-famous, generic, and does not belong to IBM.  It is generic and unprotected.

18.   Further, IBM no longer makes personal computers, and has been out of that field since 2004.

19.   As a result, the phrase "IBM PC" has a specific, historical connotation that web users associate primarily with early personal computing (including IBM's competitors), and certainly not with any modern IBM product line.  There is zero risk that purchasers of the collectible artwork will be confused by the provenance or sponsorship of the NFT trading cards.

20.   The content of Webviously's website at IBMPC. io contains artwork that depicts the IBM logo, such as on the monitor (as the boot screen) and the logo badge on the desktop unit itself.  This constitutes permissible "fair use" of IBM's logo and trade dress because Webviously's product line promotes

original artwork that it created to celebrate the 40th anniversary of the first IBM PC and the movement that followed.

21. Webviously lays out its *prima facie* claim for "fair use" below, to demonstrate that Webviously has a legitimate claim to this domain, a *bona fide* business interest built around it, and the absence of bad faith.

22. In short, Webviously use of IBMPC.io is neither as a squatter nor a thief.

23. Instead, Webviously has created an original, electronic art product within the bounds of fair use, and Webviously markets this artwork via a domain name that uses a generic phrase.

24. IBM is not entitled to transfer or cancel <IBMPC.io>.

25. The process by which "IBM PC" became a generic phrase finds its roots in the very same forces that caused IBM to abandon the personal computer industry altogether.  We therefore begin with a short discussion of the history of the personal computer.

### History of the IBM PC and its "clones" which soon flooded the market

26. IBM introduced the first personal computer in 1981, using off-the-shelf parts and an open-source architecture that made it easy for other companies to follow suit.

27.   IBM's competitors immediately began building nearly identical machines

with "the same off-the-shelf parts that IBM used in their machines."[2]  And,

IBM entered into a non-exclusive license with Microsoft for its software

operating system, which further lowered the barriers to entry.

28.   These "clones" were "cheaper in most cases…and by 1985 dominated the

overall sales of IBM PCs." *Id.*

29.   The competition was a boon for the overall PC market, but "detrimental to

IBM's PC growth."  *Id.*   IBM attempted to regain market control in 1987 by

launching a proprietary machine called the PS 2 (Personal System/2).  *Id.*

However, all of IBM's competitors refused to license the technology, which

was not compatible with the PC.  The new concept failed to attract much

market share.  *Id.*

30.   IBM soon abandoned the PS 2, and instead chose to compete within the

original IBM PC-compatible market, which was heavily diluted by the IBM

PC clones.  *Id.*

31.   Thirteen years after the launch of its first machine, IBM finally attempted to

obtain federal trademark protection for the phrase "IBM PC."  *See,*

uspto.gov, US Serial # 74520581, (Initial Filing: May 6, 1994).

---

[2] "How IBM Lost Control of the PC Market," Forbes, August 25, 2021.
https://www.forbes.com/sites/timbajarin/2021/08/25/attack-of-the-clones-how-ibm-lost-control-of-the-pc-market/?sh=59f1def25b81

32. However, after initiating its filing, IBM discovered that such protection was unavailable for the "IBM PC".  The phrase had become generic and ubiquitous within the consumer computer marketplace.

33. Upon information and believe, the examiner advised IBM that its attempted filing would be rejected because of the genericized nature of the mark.

34. IBM abandoned its claim.

35. The word mark "IBM-PC" has been dead since April 7, 1995.  *See,* uspto.gov, US Serial # 74520581.

36. Nine years later, IBM exited the PC arena altogether, selling all of its personal computing assets to Lenovo.

### The domain <IBMPC.io> is neither identical to, nor confusingly similar to IBM's mark.

37. IBM may own dozens of trademarks in dozens of countries, but, IBM does *not* have any rights in the phrase, "IBM PC."  This is fatal to its effort to cancel Webviously's rights in the domain.

38. Instead, "IBM PC" is a world-famous _generic_ mark which refers to the class of computers launched in 1981.  PCs were sold by dozens of competitors who ultimately dwarfed IBM's market share, and drove it out of the very market it created.  Along the way, the phrase "IBM PC" became synonymous with the type of computer, rather than the specific IBM branded PC.

39. A generic (or genericized) trademark is once which becomes synonymous with a general class of products, regardless of the intent of the trademark's owner. *Park 'n Fly v. Dollar Park & Fly*, 469 U.S. 189, 194, 105 S. Ct. 658, 661 (1985). A common example of a genericized mark is the "escalator," which was initially a unique brand name, but is now the common name for all iterations of that product.

40. In the early 1980s, "IBM PC" quickly became synonymous with an entire class of personal computing products. These "clones" soon flooded the market and overwhelmed IBM's market share. "It didn't take much time for others to clone IBM's PCs and use the same operating system developed by Microsoft."[3]

41. The clones continued to be referred to as "IBM PCs," even though they were manufactured by competitors like Compaq, Dell, Hewlett Packard, and NEC.

42. IBM failed to adapt to these market forces. As one management consultant observed, "IBM did not understand the importance of the PC".[4]

43. By 1993, "IBM stunned the world by reporting quarterly losses of $8 billion, caused by increased competition and a changing market." *Id*. And, notably,

---

[3] https://digital.hbs.edu/platform-digit/submission/transformation-of-big-blue/

[4] http://news.bbc.co.uk/2/hi/business/4336253.stm "How IBM misjudged the PC revolution"

at that time IBM had *still* not yet attempted to seek trademark protection for the mark "IBM PC."

44.   By the time of IBM's registration attempt the following year (1994), it was far too late to protect the mark, which had become generic by the early to mid 1980s.[5]

45.   IBM's administrative complaint failed to address the most critical issue in this dispute, which is that IBM PC is a generic mark. Instead, IBM attempted to parse out the pieces of the domain name, while also mis-applying Section 1.7 of the WIPO Overview 3.0.

46.   In IBM's view, the relevant mark is "IBM" which it asserts is recognizable within the domain name. But, the relevant mark in *this* instance is not IBM, but instead IBM PC. The entirety of that generic mark is the domain name. IBM cannot assert confusion due to its own mark's presence within an unprotected, generic mark. And, notably IBM provided no authority for that proposition.

47.   Instead, IBM cited to inapposite misuse cases, such as <apple-9.com>.

---

[5] In fact, a 1984 consumer computer magazine ran a column by a patent attorney, who offered "IBM PC" as an example of a trademark that might face the threat of generic status if not handled properly, because in those cases, "through improper use, the mark becomes equivalent to the name of the product." The column even recommended federal registration of IBM's trademark as a preventative measure (a full decade before IBM attempted that registration). *PC Magazine,* "Taking Care of Your Trademark," February 21, 1984, p. 479
https://books.google.com/books?id=UCIvSU6Y2GAC&pg=PA479&lpg#v=onepage&q&f=false

48. Webviously agrees that "a user of a mark may not avoid likely confusion by appropriating another's entire mark and adding descriptive or non-distinctive matter to it". *E.g., Lilly ICOS LLC v. John Hopking / Neo net Ltd.*, WIPO Case No. D2005-0694.  Examples of that type of appropriation with more common marks include "<apple-9.com." and " <priceclub2000.com>, which were found to be confusingly similar knock-offs to the Apple and Price Club marks.

49. That is not the situation here.  Webviously did not "add" descriptive or non-distinctive elements to the IBM mark, but, instead, chose an existing, generic mark for its domain name.

50. Nor can IBM assert any current usage of the phrase "IBM PC."  As IBM concedes, there is no such thing in today's world as an "IBM PC."  IBM stopped making *bona fide* "IBM PCs" in 1987, and, IBM sold its entire personal computing division to Lenovo in 2004.  And, the world has largely stopped referring to that class of personal computers as IBM PCs.

51. As a result, the concept of an "IBM PC" now refers to an antique class of computers…which are all technological relics.

52. Notably, Google's search engine provides further evidence of the historical (rather than ongoing commercial) nature of the phrase "IBM PC." Searching for the term "IBM PC" and "IBMPC" yields countless websites that discuss or relate to  the launch of the personal computing revolution in

1981, including the first IBM PC computer and its clones in the years after. In fact, Webviously was unable to find any other topic within the first 10 pages of search results *other* than those which address the historical nature of the term IBM PC.   It should be noted that within these search results a web user would also find <ibm-pc.org>, which utilizes a nostalgic, retro style to deliver archival information about the IBM PC.

53.   A factfinder, with little effort, can recognize that the web pages returned from this search term are overwhelmingly for historic, archival, nostalgic, cultural, or celebratory purposes, much like tbe tenor of Webviously's website.

54.   In short, the phrase "IBM PC" is a generic term which web users associate with a specific class of historical products, rather than with IBM's current product offerings.

55.   IBM did not seek to protect the mark until long after it had become genericized.

56.   IBM is unable to prevent a third-party from using a generic mark as a domain name, even if its own mark is found as a part of it.  IBM lost the right to challenge this decades ago.

**Webviously has rights and legitimate interests
in using the <IBMPC.io. domain name**

57.     Pursuant section 4(b) of the Dispute Resolution Policy, "any of the following

circumstances, in particular but without limitation [if proved] shall be

evidence of the registration and use of a domain name in bad faith:

> (i) circumstances indicating that you have registered or
> you have acquired the domain name **primarily for the purpose
> of selling, renting, or otherwise transferring the domain
> name registration to the complainant who is the owner of
> the trademark** or service mark or to a competitor of that
> complainant, for valuable consideration in excess of your
> documented out-of-pocket costs directly related to the
> domain name; or
>
> (ii) you have registered the domain name **in order to
> prevent the owner of the trademark or service mark from
> reflecting the mark in a corresponding domain name,**
> provided that you have engaged in a pattern of such
> conduct; or
>
> (iii) you have registered the domain name **primarily for the
> purpose of disrupting the business of a competitor;** or
>
> (iv) by using the domain name, you have **intentionally**
> attempted to attract, for commercial gain, Internet users
> to your web site or other online location, **by creating a
> likelihood of confusion with the complainant's mark as to
> the source, sponsorship, affiliation, or endorsement of
> your web site** or location or of a product or service on
> your web site or location

58.     The circumstances set forth in 4(b)(i), (ii), (iii), and (iv) are not found here.

59.     Webviously does not seek to sell the domain to IBM, and, thus, subsection (i)

does not apply.

60.    Webviously is also clearly not attempting to prevent IBM from reflecting the mark in a corresponding domain name, and, thus subsection (ii) does not apply.

61.    Webviously is not seeking to disrupt IBM's present business, and, instead seeks to honor one, narrow aspect of its *historical* business.  There is no known overlap between IBM's current business model and Webviously's creation and marketing of artwork in celebration of the first personal computer.   And, Webviously's website is *laudatory* of IBM, generally, rather than critical or disruptive.  Thus, subsection (iii) does not apply.

62.    Notably, sub-sections (i), (ii), and (iv) each contain a <u>predicate</u> requirement, namely, that the Complainant must actually hold an <u>existing</u> trademark that is at issue.  As explained above, IBM does not hold trademark rights in the generic mark "IBM PC."  Nor has IBM held such rights at any time during the past three decades.  It is not possible for a party to use a *generic* trademark in a manner that creates confusion with the *protected* mark.

63.    Further, IBM concedes that Webviously includes a disclaimer on its website to explain that its artwork is not sponsored by IBM:

> Copyright 2021 Webviously Inc. and The IBM PC NFT Experience, a Fan-Art Project | Not affiliated  with International Business Machines Corp., we're just really huge fans.

64.    Webviously's website also explains the historical nature of the PC product, which has been out of production for decades.

65. There is no reasonable possibility that Webviously's domain name will be confused with IBM's ownership or endorsement, and Webviously has intentionally attempted to avoid an appearance of endorsement.

66. And, Webviously's underlying efforts to celebrate the IBM PC with commercial artwork also constitute fair use, as discussed below.

67. Furthermore, the domain name <IBMPC.io> is actually embedded within the code for the NFT, and as such, cannot be removed from it.

68. In short, Webviously meets this element because it is using a domain name that incorporates a long-genericized term to advance a legitimate purpose.

**Webviously did not register <IBMPC.io> in bad faith,
and is not using it in bad faith**

69. Pursuant section 4(c) of the Dispute Resolution Policy, "any of the following circumstances, in particular but without limitation [if proved] shall demonstrate [Webviously's] rights or legitimate interests to the domain name for purposes of" this dispute:

> (i) ...use of, or **demonstrable preparations to use**, the domain name or a name corresponding to the domain name in connection with a **bona fide offering of goods or services** [before any notice to Webviously of the dispute];
>
> or...
>
> (iii) [Webviously is] making a legitimate noncommercial or **fair use of the domain name**, **without intent** for commercial gain **to misleadingly divert consumers or to tarnish the trademark** or service mark at issue.

70. Webviously made demonstrable preparations to use the domain in connection with a bona fide offering of goods and services: upon purchasing the domain name, Webviously put it to use within a few short weeks to display and promote its artwork, which was officially launched in connection with the celebration of the 40th anniversary of the IBM PC on August 12, 2021 (three months after registration).

71. After this kick-off event, Webviously continued to utilize and promote content on the IBMPC.IO website through social media channels. It is clear that Webviously intended from the outset to continue using the domain name in question for ongoing purposes connected with its use.

72. IBM asserts that it sent several cease-and-desist letters, beginning in May 2021. However, none of those were received by Webviously. Indeed, the domain ownership information was "locked" (and thus anonymous) by the registrar until very recently, when this Complaint was filed. All of IBM's attempts at communication were therefore sent to the registrar (GoDaddy) and the hosting company (Google) but not to Webviously. Not a single one of those communications to the registrar and hosting company were forwarded to Webviously. A failure to answer mail that was never received is not bad faith.

73. Moreover, Webviously's website includes contact information for Webviously, and, yet IBM did not attempt to make any direct contact with Webviously.  It is unclear why.

74. Later, IBM's agent (BSA) made contact with other third-parties who were hosting the blockchain portion of Webviously's digital artwork (and at this time issued wrongful "takedown notices" that contained knowing misrepresentations).

75. Yet, *even then,* neither BSA nor IBM attempted any direct contact with Webviously.  Instead, Webviously found out about this obliquely, and had to demand copies of whatever had been sent to the third-parties in order to discern what communications had taken place.  At that point, Webviously finally discovered that BSA was involved.

76. Upon information and belief, BSA is the agent of IBM for all matters pertaining to Webviously, Inc.  (If not, Plaintiff will seek to add BSA as a party.)

77. When Webviously finally learned this, Webviously promptly reached out to BSA.  Getting a response from BSA proved nearly impossible.  And, when communication finally did occur, the nature of the communications was *not* a demand to cease and desist usage of the <IBMPC.io> domain, but, instead, were simply inquiries by BSA asking for Webviously to explain its rationale for use.

78.  The *very first time* that Webviously received any information about a demand to stop using this domain was in the administrative Complaint itself, in February 2022.  Thus, none of those prior attempts to contact the domain holder can be used as evidence of bad faith.

79.  In the fall of 2021, when BSA requested an explanation about Webviously's claim for use, Webviously promptly replied.  If anything, Webviously has approached this matter in good faith.

80.  Section C-iii of IBM's administrative Complaint contains several assertions about confusion that have no factual basis.  IBM asserts that "the use of the Complainant's distinctive mark IBM in the domain name is confusing for most internet users."  This is the opposite of what the Google search term results demonstrate (discussed above). Instead, internet users confronted with the term IBM PC are almost universally intending to find websites about that era of computing, rather than any computer-related products associated with IBM.

81.  The administrative Complaint also asserts that Webviously's bad faith can be demonstrated by its plan to turn its responsive letter to BSA.org into an NFT.  Again, this is nonsense, and, the real thrust of the BSA communication was about the *content* of the website itself, not the domain name.  Webviously was dumbfounded that BSA did not understand that the contents of the website were artistic, commercial fair use.  BSA's take-down

notices issued to third-parties had a chilling effect on Webviously's business

relationships. BSA's take-down notices appeared to be (at least partially)

automated, rather than the product of any human discretion, and yet, they

severely interfered with Webviously's attempt to sell artwork. This is both

reckless and wrongful.

82.    Webviously spent considerable time and effort simply trying to find someone

at BSA to return a phone call or email. Faced with BSA's intransigence, and

Webviously sent a detailed letter to lay out its position, and, even included

language about Webviously's plan to turn that letter into a marketable NFT

(as a litigation fundraiser) in order to demonstrate how serious the situation

was, and, to demonstrate that Webviously believed in good faith to have a

defensible position.

83.    The administrative Complaint also asserted that Webviously's disclaimer

was not large enough, and, therefore that this should somehow weigh against

Webviously as proof of bad faith. Webviously believes the disclaimer is

sufficiently obvious.

84.    Again, all of this begs the question that remains at the center of the dispute,

which is what rights does IBM have in a generic mark. It is difficult to

imagine how a party could commit bad faith by registering a generic mark in

any circumstance, let alone these circumstances here, with a mark that

*became* generic by IBM's own business practices, coupled with its lax

18

protection of the mark for 13 years, which culminated in its failed trademark filing in 1994.

85. Webviously has searched the WIPO decision database several times looking for a case that is truly a comparable precedent, and there do not seem to be any.  That is perhaps not surprising because the facts here are so unique.  The complaining party allowed one of its own marks to become generic, which incorporates the company's own name, and it now attempts to rectify that oversight thirty years later.  That is not a proper use of the domain complaint process.

86. When the decision is written in this matter, Webviously expects that it may be the first of its kind, standing for the proposition that a domain name containing an otherwise protected mark is nevertheless still permissible when it employs a phrase that has achieved generic status.

**Webviously's content on its
website constitutes fair use.**

87. Finally, Webviously offers the following to explain why the *content* of its website makes acceptable use of the IBM logo, name, and product images, *i.e.,* the digital collector-art project called "The IBM PC NFT Experience," as well as the content found at  https://ibmpc.io, which is the website promoting this fan-art.

88. It is Webviously's position that the website and the NFT project constitute permissible, fair use.  Webviously can make a *prima facie* showing that these are derivative in nature, and, employ new, stylized artistic work that commemorates an historic event, and pose no risk of confusion as to their source.

*89.* We note at the outset that each of the products and materials contains a legal notice that alerts users that the art is "*Copyright 2021 Webviously Inc. and The IBM PC NFT Experience, a Fan-Art Project | Not affiliated with International Business Machines Corp., we're just really huge fans.*"

90. The question in these types of cases involves a balancing test between the protection of trademark for commercial use versus the artistic protections of free expression afforded by the First Amendment.

91. A leading case on this issue presented a similar issue involving the unlicensed, artistic use of the Alabama Crimson Tide logo and trademark.  In that case, the University of Alabama sued an artist for depicting the Alabama football team and its distinctive helmets, jerseys, logo, colors, and stadium in his paintings. All of the intellectual property for the Crimson Tide is obviously the property of the University.  Yet, an artist also has very broad constitutional protections for creating his or her artwork.  In that case, the Eleventh Circuit held that trademark protection must be construed "narrowly when deciding whether an

artistically expressive work infringes a trademark." *Univ. of Alabama Board of Trustees v. New Life Art,* 683 F.3d 1266, 1278 (11th Cir. 2012).  This is the same rule employed by other federal circuits.

92.   In another similar case, the Sixth Circuit addressed a claim of false endorsement under the Lanham Act where an artist had painted a collage of Tiger Woods images. *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 918-19 (6th Cir. 2003).  Tiger Woods's publicity company sued the artist, and the court applied the same balancing test.  The Court found that Tiger Woods's image on the painting had artistic relevance to the underlying work, and that it did not explicitly mislead consumers as to the source of the work.  *Id.* at 936-37.  As a result, the painting was protected by the First Amendment against a claim of false endorsement.

93.   In *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group*, 886 F.2d 490 (2d Cir. 1989), the defendant (Bantam) published humorous versions of "Cliffs Notes" study guides, which intentionally imitated the plaintiff's trademarked black and yellow covers. *Id.* at 492. The Second Circuit used the same balancing test, which is "generally applicable to Lanham Act claims against works of artistic expression."  Using this test, the Court found that the parody books were protected by the First Amendment because the defendant had not explicitly misled consumers as to the source or content of the books. *Id.* at 495-96

94.  The touchstone in each of these cases is the premise that trademark protections can be "construed to apply to artistic works *only* where the public interest in *avoiding consumer confusion* outweighs the public interest in free expression." *Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.,* 683 F.3d 1266, 1277 (11th Cir. 2012).  In situations where there is not an intentional attempt to mislead, the "slight risk" of implicitly suggesting an endorsement is "outweighed by the danger of restricting artistic expression." *Id.,* 1277.

95.  There is not intentional conduct to mislead, and little or no risk of confusion here.

96.  It is unlikely that anyone will perceive that IBM is implicitly endorsing this product.  First, it is imperative to point out the disclaimer found on each piece of art:  **Not affiliated with International Business Machines Corp., we're just really huge fans.**

97.  In addition, this artwork celebrates a consumer product that was released in 1981, and which has not been commercially available in the marketplace for decades.

98.  After review of IBM's copyrighted materials, we have found no materials that bear any similarity to the content of this artwork.  IBM did not copyright its boot screen, nor did it copyright the name badges on the outside of its computers. The sole item of comparable text from any sample materials

supplied by BSA.org is simply the name "IBM" and its logo within its

manuals.  IBM does not have a "copyright" that applies to the images in this

situation.  Instead, what Webviously created is original art, and Webviously

holds the copyright to it.

99.  On the issue of **trademark**, Webviously's work is a permissible, non-

infringing use. The nature of Webviously's project is like a fan club,

celebrating the 40th anniversary of the release of the IBM PC.  The fan club

project centers upon original and collectible fan art.  These are akin to trading

cards or limited print posters, with the only difference being that they are an

intangible digital vehicle by which to transmit the artistic images.  Webviously

has characterized this community thusly:  "the purchasers of this art are a

small but energetic community that is proud and excited to celebrate IBM's

accomplishment, which forever changed the face of computing."  A similar

product would be a small but energetic community that purchases limited

edition prints depicting the fiftieth anniversary of the 1969 Ford Mustang.

Nobody would assume that Ford was behind artwork like that.  Likewise,

nobody assumes that IBM is behind this artwork.  Indeed, IBM doesn't even

make personal computers.

100.  Webviously's claim to artistic use is also supported by the fact that the images

it distributes on an electronic platform "are 100% original, painstakingly

created by us 'from scratch.' "  Those images are created as "vector art,"

namely, that Webviously "independently mapped each curve and line" from a myriad of sources, and, that this process required "<u>several months</u> to create all of these images, all of which are inspired by (and modeled after) dozens and dozens of individual photographs found within the public domain." These include photos of the front of the CPU, its monitor and accessories.

101. Webviously's claim to original work is also buttressed by the fact that no other individual in the world has ever attempted to recreate the IBM PC in artwork like this, nor to capture the level of detail.  Indeed, not even IBM itself created imagery this extensive and detailed when they released the product. The source photos used by Webviously were found in modern eBay listings, vintage computer collector forums, museums, even magazine articles from 1981.

102. From those Webviously created a composite suite of artwork, depicting this consumer product with better imagery and in a better light than when it was first unveiled 40 years ago, including the IBM logo which is "artistically portrayed on the monitor, as well as on the logo badges, in homage to the same manner that IBM initially used for the 5150 PC's boot screen."  The logo on the boot screen, and the IBM badges and logo are integral to the work itself.  Demands that Webviously removing these logos from the artwork are misplaced because this would *materially* and *detrimentally* change the artwork

24

itself:  without them, Webviously would appear to be celebrating a generic competitor's IBM PC-compatible knock-off product.

103.   In much the same way, Andy Warhol's famous prints portrayed Campbell's soup as art, and idealized an item of commerce.  Indeed, part of the uniqueness of his art was the elevation of commerce itself.  Removing the "Campbell's" portion from his work would cause it to lose its character and effect:  without the logo, his prints would simply be celebrating tomato soup.

104.   In much the same way, Webviously asserts that a photographer or computer graphic artist could create a limited, numbered set of realistic prints depicting the very first rotary dial telephone, complete with American Bell Telephone Company's logo, and then sell them as collectible artwork without infringing upon Bell's trademarks.

105.   Or, like the University of Alabama artist, the fact that he was painting the Crimson Tide football team was an integral part of his work:  without the use of the team logos, he would be painting a generic football scene, divorced from and devoid of the emotion, history, familiarity, and attachment of its fans.  Within Webviously's work, as within Warhol's soup images, and as within the Roll Tide scenes, the homage to the brand is inherent in the art itself.  Expunging the brand would change (and devalue) the art.  This is what makes Webviously's use permissible.

106. Furthermore, Webviously notes that it is not selling any product or service that in any way competes with or dilutes the IBM brand.  Webviously is selling a collectible artwork experience, and not selling computers, computer accessories, or cloud data services.  Instead, it is selling an ultra-modern version of an electronic trading card that depicts an obsolete (though revered) product…its tokens depict a computer which is so old that it could not display, load, or store the images of the trading cards you are selling.

107. Informing all of this is the fact that IBM does not own the trademark to the phrase "IBM PC."  In fact, nobody does.  It is now considered a generic term to describe a class of personal computing devices.

108. In conclusion, Webviously asserts that its underlying work found on <IBMPC.io> is permissible, and if challenged, it expects a Court would hold the same way.

109. To paraphrase the key language of the *Alabama* decision, we substitute a handful of pertinent facts about The IBM PC NFT Experience:

> In this case, we readily conclude that [Webviously's] [artwork], prints, and [images] are protected under the *Rogers* test. The depiction of the [IBM logo] in the content of these items is artistically relevant to the expressive underlying works because the [IBM logo] and designs are needed for a realistic portrayal of [a] famous [product] from [IBM's and American computing] history. Also there is no evidence that [Webviously] ever marketed an unlicensed item as "endorsed" or "sponsored" by [IBM], or otherwise explicitly stated that such items were affiliated with the [Company].  [Webviously's] [artwork], prints, and [images] very clearly are

embodiments of artistic expression, and are entitled to full First Amendment protection. The extent of [Webviously's] use of the [IBM] trademarks is their mere inclusion (their <u>necessary</u> inclusion) in the body of the image which [Webviously] create[d] to memorialize and enhance a particular [product] in [IBM's and American computing] history. Even if "some members of the public would draw the incorrect inference that [IBM] had some involvement with [Webviously's artwork], prints, and [images] . . . that risk of misunderstanding, not engendered by any overt [or in this case even implicit] claim . . . is so outweighed by the interest in artistic expression as to preclude any violation of the Lanham Act. *See, Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1278-79 (11th Cir. 2012)

110.   Webviously did not merely choose random letters and add them to IBM's name. Webviously is not selling products which compete with those that IBM sells. Webviously is not attempting to harm or denigrate the IBM brand. Instead, Webviously chose a domain name that utilizes a phrase to which nobody can assert ownership.

111.   Using this domain name, IBMPC.io, Webviously then built a website to showcase digital artwork that celebrates an historic achievement of IBM and its numerous clones

112.   The presence of IBM's name within the domain name is not dispositive, in this rare case, because the domain name itself reflects a generic mark that is synonymous with the same movement celebrated by the website.

113.   IBM is not entitled to transfer of the mark.

<u>C**OUNT**</u> **1:**
**DECLARATION OF RIGHTS:**
*"IBM PC" IS GENERIC*
**28 U.S.C. § 2201**

114.  Webviously seeks a declaration that the phrase "IBM PC" has reached generic status, both nationally and internationally.

115.  Such a declaration is integral to other aspects of the current disputes between these parties, including Webviously's current domain registrations.

116.  Such a declaration is also integral to future disputes, including Webviously's other, planned registrations that would use that phrase.

117.  As part of this, Webviously also seeks a finding of this Court that IBM *knew* that the phrase IBM PC had reached generic status, as of 1995 when it abandoned its attempt to register that mark.

<u>C**OUNT**</u> **2:**
**DECLARATION OF RIGHTS"**
*RIGHT TO THE IBMPC.IO DOMAIN*
**28 U.S.C. § 2201**

118.  Webviously is entitled to retain the domain name IBMPC.io.

119.  In a recent administrative proceeding, IBM brought a claim against Webviously for its use of the domain name IBMPC.io.  *See,* WIPO Case No. DIO2022-0004.

120.  That proceeding was lodged under the .IO Domain Name Dispute Resolution Policy[6] (the "Policy"), the Rules for .IO Domain Name Dispute Resolution Policy[7] (the "Rules"), and the WIPO Supplemental Rules for .IO Domain Name Dispute Resolution Policy[8] (the "Supplemental Rules").

121.  The panel held in favor of IBM and ordered that IBMPC.io be transferred to IBM.

122.  Like the Uniform Dispute Resolution Policy for high-level domains, and the .IO Rules recognize in paragraph 4(k) that "[T]he mandatory administrative proceeding requirements . . . shall not prevent either [Webviously] or the complainant from submitting the dispute to a court of competent jurisdiction for independent resolution," either before a dispute is taken up by a Panel or after it renders its award.

123.  "If the Registrar receives such documentation within the ten (10) business day period, the Registrar will not implement the Administrative Panel's decision, and the Registrar will take no further action, until the Registrar receives (i) evidence satisfactory to the Registrar of a resolution between the parties; (ii) evidence satisfactory to the Registrar that your lawsuit has been dismissed or withdrawn; or (iii) a copy of an order from such court dismissing your lawsuit

---

[6] https://my.nic.io/legal/legal_dispute.html

[7] https://my.nic.io/legal/drp-rules.html

[8] https://www.wipo.int/amc/en/domains/rules/supplemental/io.html

or ordering that you do not have the right to continue to use your domain name." *Id.*

124. The Registrar, GoDaddy.com, advised the parties via email on June 3, 2022, that it had received the Decision, and that it "will transfer ibmpc.io in ten (10) business days on June 16, 2022, unless we receive during this period a complaint following the rules under Paragraph 3(b) (xiii), Rules of the Procedure."

125. IBM is not entitled to transfer of the IBMPC.io domain, nor any other similar domain employing the IBMPC phrase.

126. IBM is entitled to transfer or cancellation only if all three elements in 4(a) of the Policy have been satisfied. These elements are that:

> (i) the Domain Name registered by Webviously is identical or confusingly similar to a trademark or service mark in which Complainant has rights;

> (ii) Webviously has no rights to or legitimate interests in respect of the Domain Name; and

> (iii) Webviously has registered or is using the Domain Name in bad faith.

127. The decision reached by the panel was incorrect for several reasons, including because the panel misapplied or failed to apply the correct law to the question about IBM PC's generic status.

128. Further, as the panel held, "if the phrase IBM PC arguably reflects a generic mark in the US (an issue the Panel does not decide), it would only be generic

in relation to personal computers." This too, is incorrect. The genericized nature of IBM PC would not extend solely to personal computers. The scope of its application does not need to be resolved in this dispute, but, at a minimum, that genericized scope extends to the creation and sale of graphic representations of historic personal computers.

129. The phrase "IBM PC" reached generic status in the 1980s and 1990s.

130. IBM itself abandoned its attempt to trademark that phrase because of that generic status.

131. The Panel decision was reached in error, and without the benefit of the factfinding process of a litigation case, and also without the benefit of a legal holding by a federal court confirming the genericized status of IBM PC.

132. Further, Webviously is the registrant of other domain names employing the generic, IBM PC, phrase. *See,* WIPO Case No. D2022-1717 (ibmpc.art; ibmpc.cloud; ibmpc.club; ibmpc.co; ibmpc.online; and ibmpc.org). Without a declaration of rights, Webviously (and IBM) runs the risk of inconsistent results in other administrative proceedings.

**COUNT 3:**
**MISREPRESENTATIONS IN TAKEDOWN NOTICE**
**18 U.S.C. § 1836**

133. When a copyright owner suspects that her copyright is being infringed, the Digital Millennium Copyright Act allows her to send a takedown notice to the service provider for the site on which the allegedly infringing material is stored.

To be effective, a takedown notice must include, among other things, a "statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." § 512(c)(3)(A)(v).

134. However, § 512(f), provides that "[a]ny person who knowingly materially misrepresents under this section . . . that material or activity is infringing" may be liable for resulting damages incurred by the alleged infringer, as well as attorney's fees.

135. Webviously asserts that the takedown notices from IBM (through its agent, BSA), contained knowing misrepresentations and thus violated § 512(f).

136. Webviously holds the copyright to all of the works that were found on IBMPC.io.

**COUNT 4:**
**TORTIOUS INTERFERENCE WITH**
**EXISTING AND EXPECTANT BUSINESS RELATIONSHIPS**

137. Webviously's business relationships and business expectancies are dependent on the free use of its website and contents.

138. IBM's conduct amounts to intentional interference with Webviously's business.

139. By interfering with its business relationships, Defendant caused financial harm to Webviously.

WHEREFORE, Plaintiff requests the following relief:

a.      A declaratory ruling that the phrase IBM PC is generic and unprotected

b.      A declaratory ruling that the IBMPC.io domain, and any other similar

domains are rightfully the Plaintiff's

c.      Compensatory damages, including direct and consequential damages, and

exemplary damages to the extent that any of Defendant's conduct so merits

d.      Plaintiff's costs and disbursements;

e.      Attorneys' fees; and,

f.      Whatever other relief the Court determines is appropriate.


Dated this 16th day of June, 2022.

HOVLAND, RASMUS,
BRENDTRO, & TRZYNKA, PROF. LLC


/s/ Daniel K. Brendtro
Daniel K. Brendtro
Robert D. Trzynka
326 E. 8th Street, Suite 107
PO Box 2583
Sioux Falls, SD 57101-2583
(605) 951-9011
dbrendtro@hovlandrasmus.com
bobt@hovlandrasmus.com
*Attorneys for Plaintiffs*

**JURY DEMAND**

Plaintiff demands a jury trial.

Dated this 16th day of June, 2022.

HOVLAND, RASMUS,
BRENDTRO, & TRZYNKA, PROF. LLC


/s/ Daniel K. Brendtro
Daniel K. Brendtro
Robert D. Trzynka
326 E. 8th Street, Suite 107
PO Box 2583
Sioux Falls, SD 57101-2583
(605) 951-9011
dbrendtro@hovlandrasmus.com
bobt@hovlandrasmus.com
*Attorneys for Plaintiffs*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

WEBVIOUSLY, INC.,

**(b)** County of Residence of First Listed Plaintiff  Minnehaha, SD
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Hovland, Rasmus, Brendtro, & Trzynka, Prof. LLC, 326 E. 8th Street, Suite 107, PO Box 2583, Sioux Falls, SD 57101-2583, 605-951-9011

## DEFENDANTS

INTERNATIONAL BUSINESS MACHINES CORPORATION,

County of Residence of First Listed Defendant  Westchester, NY
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
         Plaintiff

☐ 2  U.S. Government
         Defendant

☒ 3  Federal Question
         *(U.S. Government Not a Party)*

☐ 4  Diversity
         *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                  *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **INTELLECTUAL** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | ☐ 835 Patent - Abbreviated | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | New Drug Application | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | | ☒ 840 Trademark | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards | Act of 2016 | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Act | | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 720 Labor/Management | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | Exchange |
| | Medical Malpractice | | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 791 Employee Retirement | | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | Income Security Act | **FEDERAL TAX SUITS** | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | 26 USC 7609 | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
       Proceeding

☐ 2 Removed from
       State Court

☐ 3 Remanded from
       Appellate Court

☐ 4 Reinstated or
       Reopened

☐ 5 Transferred from
       Another District
       *(specify)*

☐ 6 Multidistrict
       Litigation -
       Transfer

☐ 8 Multidistrict
       Litigation -
       Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
17 U.S.C. § 512(f)

Brief description of cause:
Plaintiff's causes of action arises out of knowing misrepresentations made by IBM in takedown notices.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE _____   SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____